UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KAREEM SWINTON,<br>  *Defendant*. | No. 3:19-cr-65 (JAM) |

### RULING ON THE ADMISSIBILITY OF STATEMENTS
### BY ALLEGED COCONSPIRATORS

Defendant Kareem Swinton is on trial for drug trafficking offenses arising from his alleged participation in a conspiracy to distribute fentanyl, heroin, powder cocaine, and cocaine base between April 2018 and February 2019. Before trial, Swinton requested a hearing pursuant to *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), on the admissibility of certain statements by unidentified individuals alleged to be his coconspirators during the time period of the charged conspiracy. I indicated that I would admit these statements on a conditional basis, but I instructed Swinton to renew his objection if he had particular concerns about statements admitted at trial and further permitted him to request that I make *Geaney* findings at the close of the Government's case-in-chief.

The Government has since presented all of its evidence, consisting in large part of numerous intercepted telephone conversations between various individuals including in most cases Swinton himself. Swinton now renews his hearsay objection to the admissibility of the intercepted statements on these calls made by unidentified individuals, and for the first time raises a further objection to statements made on the calls by alleged coconspirators whom the Government has identified and, in some cases, indicted. The Government argues that almost all of these statements are admissible nonhearsay pursuant to Fed. R. Evid. 801(d)(2)(E) as coconspirator statements made during and in furtherance of a criminal conspiracy. For the

reasons below, subject to certain exceptions, I conclude that the statements offered are admissible as coconspirator statements.

## BACKGROUND

Kareem Swinton is on trial for two alleged drug trafficking offenses: conspiracy to possess with intent to distribute and to distribute fentanyl, heroin, powder cocaine, and cocaine base between April 2018 and February 2019, and possession with intent to distribute and distribution of a controlled substance on or about December 8, 2018.[1] The Government has now rested after presenting its case over five days of trial, and the jury is deliberating. What follows is a summary of the Government's evidence showing Swinton's participation as the primary supplier of narcotics for a drug trafficking organization involving several drug dealers in southeastern Connecticut.[2]

To prove that Swinton was a supplier of distribution quantities of narcotics, the Government introduced various items of physical evidence recovered from a Maryland residence belonging to Swinton's girlfriend. These items included (1) a kilogram press and bottle jack for compacting powder-consistency narcotics into a solid brick form for distribution purposes; (2) heroin residue on the kilogram press; (3) cutting agents commonly used to dilute narcotics prior to their sale; and (4) many hundreds of empty wax folds of the kind used to distribute narcotics. The Government established through the expert testimony of a DEA agent that these items were commonly used to prepare narcotics for distribution. In addition to his ties to the apartment through his girlfriend, the Government linked Swinton to the apartment through his personal

---

[1] Doc. #789 (operative indictment).
[2] The recitation below is based on the Court's notes of trial and without the benefit of trial transcripts. If either party believes there is a material misstatement of the evidence in this ruling, they are welcome to promptly file a motion for reconsideration or amendment.

effects recovered there, including a photo identification card, mail, financial records, travel receipts, photographs of him, boxing gloves, and a boxing stand.[3]

But the Government did not seize drugs of any actual weight from Swinton. Other than the heroin residue on the kilogram press, no narcotics were found at his girlfriend's apartment. Nor did Swinton have any narcotics on him at the time of his arrest.

The only live-witness testimony about Swinton's purchasing of narcotics came from John Ellingson, a cooperating witness who claimed to have met Swinton at a hotel in Baltimore, Maryland in January 2019 and to have provided him with seven kilograms of packaged narcotics. But the defense mounted a significant challenge to Ellingson's credibility during cross-examination.[4] The Government sought to corroborate Ellingson's account with bank records showing that he had traveled from North Carolina to Baltimore in late January 2019 and with a recording of a single intercepted call from January 27, 2019, in which Swinton can be heard telling someone on another line to meet him at a hotel in twenty minutes.[5] It also offered evidence that Ellingson was involved with narcotics on a number of occasions later in 2019, and that some of these drugs were lab-tested and found to contain fentanyl.[6] But the Government did not seize any of the narcotics Ellingson allegedly provided to Swinton; nor did it offer any particularized evidence that Swinton subsequently redistributed those narcotics received from Ellingson to Connecticut or anywhere else.

---

[3] This evidence persuasively established that Swinton had access to the apartment and the items found inside it even in the absence of fingerprints, DNA evidence, or witness testimony to that effect.
[4] The defense highlighted Ellingson's overwhelming incentive to satisfy the Government, inability to present a chronological timeline of the key events in his testimony, selective memory of drug transactions involving Swinton despite claimed lack of memory about other drug-dealing, and his dubious self-portrait as a naive courier who simply happened to be recruited by a major drug cartel.
[5] Gov't Ex. 181 (recorded call), 302 (bank records).
[6] Doc. #881 (ruling admitting this evidence subject to a limiting instruction).

Instead, the Government offered the testimony of law enforcement witnesses regarding surveillance of narcotics distribution activities in Norwich, Connecticut. The most direct evidence of these activities was surveillance of hand-to-hand sales of narcotics by charged coconspirator Harold Butler as well as a controlled purchase from Butler on August 16, 2018. According to the Government, Butler's activities were linked to Swinton as the primary supplier of narcotics for the drug trafficking organization involving Butler and three other charged coconspirators—Robert Hall, David Sullivan, and Lorenzo Grier—that distributed cocaine, crack cocaine, and heroin in the Norwich-New London area.[7] The Government presented two kinds of evidence in support of this theory.

First, the Government offered the testimony of law enforcement witnesses and corroborating video evidence of three meetings between Swinton and the alleged coconspirators in Connecticut. The first meeting took place between Swinton and Butler at the Mohegan Sun casino on October 7, 2018. FBI Task Force Officer Richard Avdevich, who was performing undercover surveillance, observed Butler meet Swinton (wearing a sweater with distinctive white stripes on the shoulders) and his girlfriend in the hallway, then saw Butler and Swinton enter the restroom together and remain inside for several minutes.[8] Afterwards, he followed Butler and Swinton to the parking lot, where they got into a vehicle and drove off together.

The other two meetings took place on December 8, 2018. At around 6:00 pm, Swinton was observed getting out of a Honda hatchback wearing a sweater with white shoulder stripes and entering an apartment associated with David Sullivan. He was carrying a backpack and left

---

[7] All of these indicted coconspirators pleaded guilty and were sentenced by Judge Bryant. *See* Doc. #261 (Butler sentenced to 77 months of imprisonment for conspiracy); Doc. #474 (Sullivan sentenced to 36 months of imprisonment for conspiracy); Doc. #788 (Hall sentenced to 60 months of imprisonment for conspiracy); Doc. #595 (Grier sentenced to time served in March 2021 for use of a telephone to facilitate a drug trafficking offense). The Government did not present any evidence at trial of these guilty pleas or sentences.
[8] Officer Avdevich could not identify Swinton, but he took video of the encounter which allowed another Task Force Officer—Jason Calouro—to make the identification on the stand.

several minutes later without the backpack. Approximately half an hour later, FBI Task Force Officer Jason Calouro saw Swinton get out of the Honda hatchback and walk to the entrance of Butler's store ("Hat Boyz") carrying a white plastic bag. Other evidence showed that Butler stored drugs and drug paraphernalia at his store and sold narcotics in the apartment above the store where he lived.[9] Video captured by a pole camera across the street from the store shows someone letting Swinton into the store.[10] A few minutes later, Butler came down from the upstairs apartment and was let into the store.[11] Approximately five minutes later, Swinton left the store without the white plastic bag and returned in the direction of his car.[12] This evidence showed that Swinton had dealings with at least Sullivan and Butler during the timeframe of the charged conspiracy.

To prove that Swinton was specifically supplying the alleged coconspirators with narcotics for redistribution, the Government relied on a second type of evidence: a large number of communications intercepted from the telephones of Swinton, Butler, and Hall during the timeframe of the charged conspiracy.[13] The most obviously relevant of these conversations are those between Swinton and the Connecticut drug dealers. In these calls, Swinton arranges meetings with the dealers, checks on their inventory levels, defends the quality of the product he is selling, indicates specific weights and quantities of product he has sold or intends to sell, offers to sell "old" product he personally "cooked," expresses his desire to receive prompt payment upon delivery, demands more responsive communication, settles past debts, and insists on doing business with these individuals directly.[14] The Government also introduced calls between

---

[9] Gov't Ex. 327, 329, 355.
[10] Gov't Ex. 300 at 0:08-0:50.
[11] *Id*. at 3:35-4:25.
[12] *Id*. at 7:57-8:18.
[13] *See* Doc. #1-1 at 8-10 (affidavit of FBI Special Agent Scott Dugas describing court-authorized wiretap).
[14] Doc. #899-1 at 1-2 (Government chart of intercepted communications between alleged coconspirators).

Swinton and various other identified and unidentified individuals showing more of what the Government contended to be narcotics activity in furtherance of the charged conspiracy.[15]

Before trial, Swinton moved to exclude communications involving "several unidentified unknown speakers" on the ground that these statements "[b]y their very nature … cannot be admitted as coconspirator statements."[16] Swinton continues to object to the admission of these statements, and now further seeks to strike all statements by parties other than himself in the intercepted communications.[17]

By oral ruling just prior to the Government's resting its case, I denied Swinton's motion except with respect to ten of the audio recordings. This written ruling setting forth my reasons now follows.

## DISCUSSION

The Federal Rules of Evidence prohibit the introduction of hearsay, which is defined as an out-of-court statement that is offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) and 802. But the hearsay rule does not apply to statements of a party opponent, such as when the Government introduces statements by the defendant in a criminal trial. *See* Fed. R. Evid. 801(d)(2)(A). For that reason, all statements made by Swinton in the intercepted communications were properly admitted as nonhearsay.

But how about intercepted statements made by other individuals? Rule 801(d)(2)(E) recognizes another nonhearsay exclusion for "statements offered against an opposing party" and that were "made by the party's coconspirator during and in furtherance of the conspiracy." In other words, "an out-of-court statement offered for the truth of its contents is not hearsay if the

---

[15] *Id*. at 2-5.
[16] Doc. #836 (adopting prior motion, *see* Doc. #655 at 2).
[17] Doc. #900.

statement is offered against an opposing party and it was made by the party's coconspirator during and in furtherance of the conspiracy." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014).[18]

When a court is asked to determine whether a statement qualifies for admission under Rule 801(d)(2)(E), it must find that the proponent has carried its burden to show by a preponderance of the evidence the following three factors: "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *Id*. at 123–24.

Because Swinton raises a blanket objection to the admission of third-party statements from the audio recordings and does not flag or object to any particular third-party statement in any particular recording, the focus of my review is to conduct a one-by-one review of each audio recording exhibit and to decide whether as a whole the third-party statements that appear on each recording satisfy the requisites for admissibility under the coconspirator rule. *See United States v. Coplan*, 703 F.3d 46, 83 (2d Cir. 2012) (noting that "we have never required a district court to make particularized rulings or conduct separable analyses with respect to each coconspirator, much less each coconspirator statement").[19]

---

[18] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

[19] Several weeks ago, I invited defense counsel to raise "particular concerns about specific statements that [the defense] believes are problematic." Doc. #877. Counsel has not done so, and therefore I deem waived any argument that a particular statement does not meet the requirement of Rule 801(d)(2)(E) as distinct from an argument that declarants' statements for each conversation as a whole do not meet the requirements. Of course, because many of the particular third-party statements on the recordings do not make any assertions of fact that could be accepted for their truth, there can be no hearsay objection to admission of these statements. It is otherwise unclear to me that Swinton can point to any prejudice from the introduction of any particular third-party statement to the extent that the statement is offered for its truth rather than merely as background context for the jury's understanding of Swinton's own wiretap statements—which are indisputably admissible over any hearsay objection as statements of a party opponent under Rule 801(d)(2)(A).

7

As to the first factor (existence of a conspiracy), I must consider whether a preponderance of the evidence shows that a conspiracy existed. Here, the Government claims that the relevant conspiracy is the charged conspiracy as alleged in Count One.

As to the second factor (membership of declarant in conspiracy), I must consider whether for each conversation the evidence shows that Mr. Swinton and any declarant whose statements are offered for their truth were members of the conspiracy, although there is no need to show that the person to whom a statement is made is also a member of the conspiracy. *See United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013). As the Second Circuit has noted, "once a conspiracy has been proved to exist, the evidence needed to link another defendant with it (for purposes of a *Geaney* finding) need not be overwhelming," and "all that is required to meet the *Geaney* threshold is a showing of a likelihood of an illicit association between the declarant and the defendant." *United States v. Cicale*, 691 F.2d 95, 103 (2d Cir. 1982).

Rule 801(d)(2)(E) does not require proof of a declarant's identity or precise role in the conspiracy. As the Second Circuit has observed, a "statement may be non-hearsay within [the] meaning of Rule 801(d)(2)(E) even though [the] declarant is unidentified." *United States v. Boothe*, 994 F.2d 63, 69 (2d Cir. 1993) (citing *United States v. Cruz*, 910 F.2d 1072, 1081 n.10 (3d Cir. 1990)). What matters is proof of the declarant's membership in the conspiracy rather than proof of the declarant's name and true identity.

As to the third factor (statements in furtherance of the conspiracy), I must consider whether the declarant's statements served some purpose to advance the goals of the conspiracy. This requirement is obviously shown if the declarant urges a defendant or coconspirator to "respond in a way that facilitates the carrying out of criminal activity" related to the object of the conspiracy. *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989). But

less overt statements by coconspirators may also further a conspiracy; for example, they can "provide reassurance, serve to maintain trust and cohesiveness[,] … or inform each other of the current status of the conspiracy." *Gupta*, 747 F.3d at 123–24. Even "vague and rambling" conversations that serve one of these purposes can further a conspiracy, *United States v. Farhane*, 634 F.3d 127, 162 (2d Cir. 2011), although mere "idle chatter" or "narrative description" do not, *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199. The in-furtherance requirement presupposes of course that the statements occurred during the timeframe of the conspiracy. *See Gupta*, 747 F.3d at 123.

In *Bourjaily v. United States*, 483 U.S. 171 (1987), the Supreme Court clarified that courts making these predicate factual determinations are not barred from considering the contents of the declarant's statement in question. After all, "there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Id.* at 180.

Nonetheless, the Second Circuit has continued to require some "independent corroborating evidence" to support the conclusion that the offered statements were in fact made by a coconspirator during and in furtherance of a conspiracy. *See United States v. Daly*, 842 F.2d 1380, 1386 (2d Cir. 1988). Indeed, Rule 810(d)(2)(E) itself was amended following *Bourjaily* to require that the hearsay statement itself "must be considered but does not by itself establish … the existence of the conspiracy or participation in it." *See United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008).[20] And the Advisory Committee note indicates that, in addition to the

---

[20] This aversion to having a hearsay statement "lift itself by its own bootstraps to the level of competent evidence," *Glasser v. United States,* 315 U.S. 60, 75 (1942), stems from the concern that such statements are "presumptively unreliable," *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996). On the other hand, it follows that where sufficient indicia of reliability are present such statements may be admitted under the established exceptions to the hearsay rule. *See United States v. DeJesus*, 806 F.2d 31, 35 (2d Cir. 1986).

9

statement itself, a court should consider the circumstances surrounding the statement including factors such as "the identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement." *United States v. Schlesinger*, 372 F. Supp. 2d 711, 720 (E.D.N.Y. 2005) (quoting Fed. R. Evid. 801 advisory committee's note (1997 Amendment)).

I will now consider how these standards apply to each tranche of intercepted statements by alleged coconspirators. All of my findings are based on the preponderance of the evidence standard.

At the outset, I note that Swinton did not raise a timely objection to the admission of statements by identified parties. That alone is sufficient grounds to overrule his objection to such statements, for it is only "when the preliminary facts relevant to Rule 801(d)(2)(E) are *disputed*, [that] the offering party must prove them by a preponderance of the evidence." *Bourjaily*, 483 U.S. at 176 (emphasis added). Nonetheless, I will explain why each conversation involving these statements is admissible under Rule 801(d)(2)(E) before turning to the conversations involving unidentified speakers. To the extent that any particular call includes additional statements that I do not conclude independently furthered the conspiracy in the same manner as the examples I highlight, I conclude that these statements are nonetheless admissible because they have not been the basis of any particularized objection from Swinton and they provide necessary context for the relevant statements by a coconspirator.

### *Indicted coconspirators*

I begin with the statements made to Swinton by his indicted coconspirators Butler, Hall, Sullivan, and Grier. This category includes no fewer than seventeen calls with Butler (Government Exhibits 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 132, 134, 136, 140, 167,

168, 178). It also includes four calls with Hall (Government Exhibits 111, 116, 117, 169), two calls with Sullivan (Government Exhibits 135 and 141), and one call with Grier (Government Exhibit 187).

Swinton challenges the admissibility of these communications *in toto* rather than specifying any particular communications that contain problematic hearsay evidence. His argument for the general inadmissibility of these calls is that they lack sufficient independent corroborating evidence. But Swinton ignores the fact that his own statements on the calls are not hearsay under Rule 801(d)(2)(A) and may therefore be used to corroborate the existence of a conspiracy between Swinton and the indicted coconspirators.

I find by a preponderance of the evidence that a narcotics distribution conspiracy existed between these defendants and Swinton. First and foremost, the patently drug-related nature of the nonhearsay statements by Swinton himself in these calls, when taken collectively, establishes that during the period of the alleged conspiracy Swinton was a supplier of narcotics to Butler, Hall, and Sullivan for street-level redistribution. Moreover, the temporal fit between these calls and the surveillance footage and testimony by law enforcement officers presents strong circumstantial evidence that Swinton was specifically providing Butler and Sullivan with narcotics when he traveled to Norwich in December 2018.

In addition, each call contains a high proportion of statements made by a coconspirator and in furtherance of the conspiracy. For example, Butler repeatedly tells Swinton that he is "hungry" and needs "food" or alternatively that he still has drugs to sell, while offering to pay Swinton "C.O.D." (cash on delivery) and to provide him with the "chicken" kept in his shop.[21] In other calls Butler updates Swinton on the amount of cash he has on hand to cover past debts and

---

[21] Gov't Ex. 101, 102, 103, 105, 167.

purchase new drugs, whereupon the two men arrange a time and place to meet.[22] As for Hall, he argues at length with Swinton over whether he is to blame for a customer refusing to pay for half a kilogram of allegedly "touched" narcotics supplied and stamped by Swinton, with Hall volunteering that he personally cooked the substance in a pot for hours and knew how it turned out.[23] As for Sullivan, he tells Swinton he is home on December 8, 2018—the day law enforcement observed Swinton deliver a backpack to Sullivan's apartment—and then contacts Swinton two days later for a resupply because he needs to redistribute to other street-level dealers.[24]

    Finally, as to Grier, Swinton called him on February 20, 2019—the date on which law enforcement made a number of arrests in Connecticut and the day before Swinton's own arrest in Baltimore.[25] In the call, Swinton states that he heard something about the arrests and was seeking more information about Grier's status and his own exposure. Grier warns Swinton not to talk on the phone but then proceeds to discuss what he knows about the federal investigation and suggests that Swinton "get lost" and "stay out this shit."[26] Considering the contents of Grier's statements alongside the independent corroborating evidence of the law enforcement "takedown" executed on that date and Swinton's attempt to flee early the next morning, I conclude by a preponderance that Grier was a member of the conspiracy and sought to further that conspiracy's criminal ends by warning Swinton of law enforcement activity and helping him avoid being arrested.

---

[22] Gov't Ex. 104, 106, 107, 108, 109, 110, 132, 134, 136, 140, 168, 178.
[23] Gov't Ex. 116, 117.
[24] Gov't Ex. 135, 141.
[25] Gov't Ex. 187.
[26] *Ibid.*

Only three calls among the indicted coconspirators did not involve Swinton: one between Hall and Butler and two between Hall and Sullivan. *See* Gov't Ex. 100, 191, 192. I conclude without difficulty that the statements in these calls were also made in furtherance of the conspiracy. In Government Exhibit 100, Butler seeks to obtain fifty grams of narcotics from Hall because Swinton is not answering his phone. And in Government Exhibits 191 and 192, Sullivan encourages Hall to return Swinton's calls regarding his failure to pay for the half kilogram of allegedly "touched" narcotics. I find that each of these statements was made by a member of the conspiracy with the goal of furthering its criminal object by purchasing narcotics for redistribution or facilitating payments to Swinton as the group's narcotics supplier.

### *Uncharged, identified individuals*

The next set of statements involve identified but uncharged individuals with whom Swinton spoke during the time period of the charged conspiracy. This category includes six calls with Shariff Turner (Government Exhibits 124, 130, 183, 229, 231, 232). It also includes three calls with Theodore Jones (Government Exhibits 179, 182, 185), two calls with Herbert Qion Cooper (Government Exhibits 127, 133), and one call each with Christina Green and Carlos Rodriguez (Government Exhibits 143, 172).

Swinton contends that there is "no independent corroborating evidence whatsoever to establish that these individuals were engaged in a conspiracy with [him]."[27] Although it is true that the Government did not present any physical evidence or testimony implicating these individuals in the conspiracy, I nonetheless find that these individuals were Swinton's coconspirators in light of the otherwise robust evidence of an ongoing narcotics conspiracy and Swinton's demonstrated role as the conspiracy's primary narcotics supplier, as well as the

---

[27] Doc. #900 at 9.

13

content and timing of these intercepted conversations and the drug-related nature of the statements made by both Swinton and these individuals during the calls.

Consider first the calls between Swinton and Turner. In one conversation on December 4, 2018, Swinton says he made "$160,000 profit in two days."[28] Turner then advises Swinton to be careful dealing with a particular individual given that "officials would love to be on somebody like you," *i.e.*, a "big fish," because "if they stop you they could stop a lot of shit so they would love to."[29] In another call on December 8, 2018, Swinton complains that his product is "fire" and "a monster" but that a customer is claiming that it's "garbage," to which Turner responds that Swinton should stop selling to redistributors and should instead put his product on the street through a mutual acquaintance.[30] In a third call on January 29, 2019, Swinton complains about a buyer who failed to pay for $50,000 worth of narcotics.[31] Turner tells Swinton that "you supposed to whoop his ass right there" and that Swinton should have "kept tappin' his chin, put him down seven or eight times."[32] But Swinton explains that he left the drugs there without getting paid because he was afraid of being betrayed by the buyer and pulled over by police on his drive home, and he was "not 'bout to go to the fucking can."[33] Turner praises Swinton for this thinking, and the two agree that the buyer should be made to pay a steep price, with Swinton ultimately stating that he is going to kill him.[34] Taking these conversations together and in light of their nonhearsay elements, I conclude by a preponderance that Turner was an active member of the conspiracy and that his statements were made in furtherance of the conspiracy's illegal

---

[28] Gov't Ex. 124.
[29] *Ibid*.
[30] Gov't Ex. 130.
[31] Gov't Ex. 183.
[32] *Ibid*.
[33] *Ibid*.
[34] *Ibid*.

object of distributing narcotics for profit and collecting payment from buyers without running afoul of law enforcement.

Swinton's conversations with Jones were also in furtherance of the conspiracy. In one call, Jones asks Swinton where his compression jack is and then reports that the "shit" on the block is "cheese" and "strong as hell."[35] After telling Swinton more about these drugs, Jones offers to negotiate a high quantity buy at a low price from a third party, to which Swinton responds: "He give it to you for a nice number, I'll take it."[36] In another call, Swinton complains about Butler and Sullivan owing him money for past drug sales and Jones sympathizes with the view that Swinton should not extend them further credit.[37] In a third call on the day of the arrests in Connecticut, February 20, 2019, Jones warns Swinton that Sullivan and "your man" have been "knocked off."[38] Swinton asks "For what?" Jones then answers: "You know for what," prompting Swinton to ask, "Some federal shit?"[39] Considering these conversations cumulatively, in light of the nonhearsay drug-related statements by Swinton and the timing of the calls as well as the content of the statements by Jones, I conclude by a preponderance that Jones was a member of the narcotics distribution conspiracy and that these statements regarding narcotics purchases and law enforcement activities were made in furtherance of the conspiracy.

The remaining calls in this category also furthered the conspiracy in various ways. Swinton negotiates a drug price and then discusses the quality of his product with Cooper.[40] He similarly discusses customer reviews of his product with Green and the current market rate for

---

[35] Gov't Ex. 182.
[36] Ibid.
[37] Gov't Ex. 179.
[38] Gov't Ex. 185.
[39] Ibid.
[40] Gov't Ex. 127, 133.

narcotics with Rodriguez.[41] Each of these calls, including the statements by uncharged coconspirators, helped to establish Swinton as a successful large-scale supplier of narcotics.

### *Unidentified speakers*

The last category of intercepted calls involves eight unidentified and uncharged individuals. Nine of the calls involve UM8017 a.k.a. "Noodles" (Government Exhibits 138, 147, 148, 150, 151, 152, 153, 157, 159), nine involve UM 1176 (Government Exhibits 125, 128, 148, 154, 158, 162, 164, 165, 188), and four involve UM 8947 (Government Exhibits 173, 174, 176, 177). There are also single calls involving UM6598 (Government Exhibit 123), UF9180 (Government Exhibit 146), UM5264 (Government Exhibit 228), UF6193 (Government Exhibit 233), and UM8883 (Government Exhibit 378).

I conclude by a preponderance of the evidence that these statements were made by coconspirators during and in furtherance of the conspiracy. For starters, Swinton's conversations with Noodles indicate that Swinton was comparing the popularity of different batches of narcotics, with Noodles reporting back to him on how well the "green" brand did against the "red" brand and discussing whether it would be helpful to "smash" the drug or change its label.[42] In one call with UM1176, Swinton is looking for certain narcotics when Noodles calls him to ask where he is, to which Swinton responds "I'm coming right now."[43] Swinton then asks UM1176, "You put the shit in the box?" UM1176 answers "Yeah," and Swinton responds, "So where the fuck is the dope at?"[44]

Similarly, Swinton's conversation with UM6598 concerns the strength of different batches of narcotics and the importance of ensuring that UM6598 receive prompt and adequate

---

[41] Gov't Ex. 143, 172.
[42] Gov't Ex. 138, 147, 150, 151, 152.
[43] Gov't Ex. 148.
[44] *Ibid*.

16

payment when selling products from the stronger line.[45] And Swinton's conversation with UF9180 involves a report from a user who claimed that Swinton's narcotics had a "soapy taste" and "ain't really doing too much," which Swinton disbelieved because "everybody in, in the city said it's a ten."[46] These were clearly conversations about selling drugs, a process in which the unidentified individuals Swinton spoke with were active contributors including via these calls.

As for UM8947, he told Swinton in January 2019 that he "found a dude over there in Mexico who has what you need."[47] Swinton then negotiates on price while complaining about the quality of another source for narcotics. After UM8947 sends him a picture of the drugs, Swinton asks whether they are "the F thing," and UM8947 confirms, calling the drug "the doggy dog."[48] Swinton then agrees to have an in-person meeting to decide on quantity with a supplier from Laredo, Texas.[49] Again, based on timing, context, and the admissible nonhearsay statements of Swinton himself, these are very clearly conversations between coconspirators about the purchase of narcotics for redistribution through the charged conspiracy.

As for UF6193, Swinton asks her in a call on February 15, 2019, whether she would "sell weed," to which she replies "Yeah. Hell yeah."[50] Swinton explains that he needs to "diversify his portfolio."[51] Even when UF6193 explains that she is not in a position to be selling "bud" because she has been "working home … for some months now," Swinton says that he knew this but still "always knew you was a hustler … always looking for more money," to which UF 6193 replies "Hell yeah."[52] I conclude from the content and timing of this conversation and the nonhearsay

---

[45] Gov't Ex. 123.
[46] Gov't Ex. 146.
[47] Gov't Ex. 173.
[48] Gov't Ex. 176.
[49] Gov't Ex. 177.
[50] Gov't Ex. 233.
[51] Ibid.
[52] Ibid.

17

statements by Swinton that UF6193 effectively adopts by admission that Swinton was trying to recruit her to distribute for him and that she was communicating her interest in that proposal despite certain practical challenges.

Finally, with regard to UM8883, he repeatedly texts Swinton in early February 2019 seeking "boots."[53] He explains that he has "alots people waiting on me" and that he "need[s] to see [Swinton] bad."[54] After Swinton fails to respond, UM8883 becomes upset, insulting and threatening Swinton before resuming his plea for the delivery of "boots tomorrow 30."[55] Swinton at last replies. "My bad bro I am still on the highway," and then a day later, "Just getting up on my way to you."[56] I conclude from the content of these conversations and the broader evidence that Swinton distributed narcotics while traveling in various locations between Maryland and Connecticut that UM8883 was another drug dealer seeking a resupply of narcotics from Swinton in furtherance of the conspiracy to distribute narcotics for profit.

### *Statements containing admissions*

The Government has identified one exhibit, Government Exhibit 227, which it seeks to admit under Fed. R. Evid. 801(d)(2)(B) as an adopted admission. In this conversation on January 18, 2019, Swinton secures Frank Vitolo's assistance in buying a pickup truck on credit with a down payment of $10,000 in cash. He seals this deal by means of a side agreement to supply narcotics to Vitolo, but only after Vitolo agrees to prove to Swinton in person that he actually intends to use the drug. This conversation is relevant in two respects. First, it shows that Swinton was seeking to build credit by financing a new vehicle and that he did not want to be reported for having $10,000 in unexplained assets, which tends to show that he had an illicit source of income

---

[53] Gov't Ex. 378.
[54] *Ibid*.
[55] *Ibid*.
[56] *Ibid*.

18

and was hoping to acquire property with funds from his narcotics activities. Second, it shows that although Swinton used his access to narcotics to facilitate this transaction, he remained concerned that Vitolo might be acting as an undercover agent and therefore required proof that Vitolo was actually a user. I agree with the Government that this does not suffice to show by a preponderance that Vitolo was a coconspirator of Swinton's. But Swinton's adoption by admission of Vitolo's statements, which were essential to their agreement on the deal, makes those statements admissible under Rule 801(d)(2)(B).

Additionally, I conclude that Swinton's conversation with Aneesha Richardson in Government Exhibit 230 is admissible only for the truth of the statements made by Swinton. In this call on January 18, 2019—the same date as the call with Vitolo—Swinton discusses with Richardson how he is planning to buy a new vehicle that she will like. Later in the call, Swinton complains to Richardson about the same buyer who failed to pay for $50,000 worth of narcotics that he tells Turner about in Government Exhibit 183. Swinton tells Richardson that the buyer's debt "ain't sliding" and that Swinton's people will be "on his ass." Swinton says that it will take him "no longer than 15 seconds to make that fucking 50 thousand dollars" back, but that he is concerned about "the principle of this shit." Unlike Turner, however, Richardson does not endorse making an example out of the buyer and in fact encourages Swinton to simply "do no more business with him" and otherwise let "karma" take its course. Swinton's statements in this call are relevant to the extent that they corroborate that he purchased a new truck on credit through the arrangement with Vitolo and that he was distributing narcotics for money and considering ways to punish a buyer who failed to pay him. But at least in this conversation Richardson does not conspire with Swinton to further his narcotics trafficking activities, and therefore her statements are admissible only insofar as they provide necessary context to

19

understand Swinton's statements on the call.

## CONCLUSION

For the reasons explained above, the Court FINDS that, with the exception of the exhibits listed below, the intercepted communications introduced at trial contain statements that were made by coconspirators of the defendant during and in furtherance of the charged conspiracy which were therefore admissible pursuant to Fed. R. Evid. 801(d)(2)(E).

The Court does not find the requirements of Rule 801(d)(2)(E) met with respect to: Government Exhibits 122, 166, 175, 180, 181, 184, 190, and 371, which were admissible because they contain only nonhearsay statements made by the defendant; Government Exhibit 227, which was admissible because the statements of Frank Vitolo were adopted admissions of the defendant; and Government Exhibit 230, which was admissible only for the truth of the nonhearsay statements made by the defendant and not for the truth of any statements made by Aneesha Richardson. The Court has therefore provided the jury with an appropriate limiting instruction with respect to these exhibits.

It is so ordered.

Dated at New Haven, Connecticut this 3rd day of August 2022.

                                           /s/ *Jeffrey Alker Meyer*
                                           Jeffrey Alker Meyer
                                           United States District Judge